**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| REGINA HUDSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 08 C 3242 |
| vs. | ) |
| | ) Magistrate Judge Schenkier |
| MICHAEL ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

The plaintiff, Regina Hudson, has filed a motion seeking summary reversal and/or remand

of a final decision by the Commissioner of the Social Security Administration ("the Commissioner")

denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423 (doc. #24). The Commissioner has filed a motion seeking

summary affirmance of the decision denying benefits (doc. ## 26, 28). For the following reasons,

Ms. Hudson's motion for reversal and/or remand is granted, and the Commissioner's motion for

affirmance is denied.

**I.**

We begin with a summary of the procedural history of this case. On August 20, 2003, Ms.

Hudson applied for SSI, stating that she was disabled due to contact dermatitis, lack of left hand

---

[1] Pursuant to the consent of the parties and 28 U.S.C. § 636(c), on October 2, 2008, this case was assigned to this Court for all proceedings, including the entry of final judgment (doc. ## 11, 13).

dexterity, swelling and being unable to move her left arm for brief periods of time (R. 22, 154).[2] She alleged an onset date of October 7, 2001 (R. 22). Ms. Hudson's application was denied on December 11, 2003 (R. 108-11). On May 24, 2004, it was denied again upon reconsideration (R. 102-07).

Ms. Hudson then requested and was granted a hearing before an administrative law judge ("ALJ"), which took place on February 2, 2006 (R. 40-70). Ms. Hudson appeared *pro se* and testified (R. 42-45). A vocational expert ("VE") also testified (R. 65-67). On March 13, 2006, the ALJ issued a written decision finding that Ms. Hudson was not disabled within the meaning of the Social Security Act (R. 265-70).

On May 17, 2006, Ms. Hudson filed a request for review of the ALJ's decision. On review, the Appeals Council vacated the prior hearing decision and remanded the case under the authority of 20 C.F.R. § 416.1477 based on the failure to proffer Exhibits 5F and 6F, which were received after the hearing (R. 22).[3]

A second hearing took place on March 1, 2007, before the same ALJ as in the original hearing (R. 71-97). Ms. Hudson appeared with counsel and testified; the ALJ also received testimony from a VE. At the hearing, Ms. Hudson's counsel asked to amend her alleged onset date from October 1, 2001 to November 6, 2005 (R. 75). On July 24, 2007, the ALJ issued a second written decision again finding that Ms. Hudson was not disabled (R. 22-23). The ALJ adopted the

---

[2] Contact dermatitis is defined as "acute or chronic dermatitis caused by materials or substances coming into contact with the skin, which may involve either allergic or nonallergic mechanisms." *See Dorland's Illustrated Medical Dictionary* 479 (29th ed. 2000).

[3] In its remand order, the Appeals Council also associated a duplicative claim for Title XVI benefits filed by Ms. Hudson on May 18, 2006, with the original claim (R. 22).

earlier decision of March 13, 2006 (R. 22), except to amend the decision to accept plaintiff's "explanation as to why her left hand is worse than the right" (not the other way around) (R. 22).

Ms. Hudson filed a request for review of this decision on July 31, 2007 (R. 16). This time, the Appeals Council denied Ms. Hudson's request, making the ALJ's decision the final decision of the Commissioner (R. 6). On August 8, 2008, Ms. Hudson initiated this civil action for judicial review of the Commissioner's final decision.

## II.

We begin our review of the Commissioner's determination with the governing legal standards. In order to establish a disability under the Act, a claimant must show: "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant needs, further, to show that her impairments prevent her from performing both past work and any other work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A).

The social security regulations set out a five-step test to determine whether a claimant has a disability. 20 C.F.R. § 404.1520(a)(4). The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is able to return to past relevant work; (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4); *see also Young v. Sec'y of Health and Human Serv.*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or Step 5. 20 C.F.R. § 404.1520(a)(4). A negative finding at any step other than Step 3 precludes a finding of disability. *Young*, 957 F.2d at 389. The claimant bears the burden of proof at every step except Step 5, where it shifts to the Commissioner. *Id.* In the case of a severe impairment which, nevertheless, does not satisfy a listing at Step 3, the ALJ must then determine the claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(e). The RFC is used at Steps 4 and 5 to determine, respectively, whether the claimant could return to her past relevant work, and whether she could adjust to other work. 20 C.F.R. §§ 1520(f)-(g). Although the burden shifts to the government at Step 5, the government is not responsible for producing any evidence regarding the claimant's RFC. 20 C.F.R. § 404.1560(c)(2). This is because the RFC applied at Step 5 is the same as at Step 4, where the claimant bears the burden of proof. 20 C.F.R. § 404.1560(c)(2).

In reviewing the ALJ's decision, the Court may not decide facts anew, reweigh evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the ALJ's findings of fact where they are supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Young*, 957 F.2d at 388. The substantial evidence standard requires that the ALJ's findings be supported by "such relevant evidence as a reasonable mind might accept as adequate." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In cases where reasonable minds could differ given competing evidence, the responsibility of assessing the credibility of evidence and of assigning weight to evidence, lies with the Commissioner (and by extension the ALJ), not with the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). If substantial evidence exists to support the ALJ's

4

overall conclusion, then it should be affirmed. *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 447 (7th Cir. 2004).

This Court is not obliged, however, to accept any of the ALJ's findings not supported by substantial evidence, nor is it required to accept the ALJ's decision if it finds that he made an error of law. *Schmoll v. Harris*, 636 F. 2d 1146, 1150 (7th Cir. 1980). The ALJ is obliged to consider all relevant evidence both for and against the claimant, not merely evidence that favors his decision. *Herron*, 19 F.3d at 333. While the ALJ need not evaluate in writing every piece of evidence in the record, his analysis must be sufficiently articulated to make reasonably clear the reasons for accepting or rejecting "entire lines of evidence." *Id.*; *see also Young*, 957 F.2d at 393 (the ALJ must articulate a reason for rejecting evidence "within reasonable limits"). Moreover, the ALJ must supply a sufficient "logical bridge from the evidence to the conclusion" such that the reviewing court can assess whether his decision was supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

## III.

The following facts are taken from the record and are material to the decision we are reviewing. We begin with general background information (Part A); then we set forth evidence concerning Ms. Hudson's subjective medical complaints (Part B) and the objective medical evidence (Part C); and, finally, we discuss both hearings before the ALJ (Part D).

## A.

Ms. Hudson was born on November 6, 1955 (R. 99). On October 19, 2003, Ms. Hudson was 69 inches tall and weighed 275.5 pounds (R. 267). Ms. Hudson began but did not complete

5

her sophomore year of high school; she has no further education (R. 46-47). She lives with her grandmother, who as of March 1, 2007 was 70 years old (R. 80, 145).

Ms. Hudson tries to do "what she can around the house," including basic cooking (such as frying an egg), dusting, and washing dishes when the pain in her hands is not "really bad" (R. 57, 81). Ms. Hudson's cousins take her grocery shopping. She testified that she and her grandmother complete the housework between them (R. 80).

Ms. Hudson has not been employed since August 2001 (R. 79). In the past, Ms. Hudson held temporary positions, mainly working as a receptionist and in switchboard positions, and she also worked as a bartender (R. 48-50, 80). In her receptionist positions she worked eight hours per day, four to five days per week (R. 49-50). Ms. Hudson testified that she worked as a bartender from 1998-2001 (R. 48), and that she held temporary jobs from 1986-1995 (R. 49).

### B.

Ms. Hudson cited a wide variety of pain and other symptoms that she claimed prevented her from working. Ms. Hudson described "pretty constant" pain in her lower back that travels down her right leg (R. 59-60). The intensity of the pain, she said, varies depending on her activity. For example, Ms. Hudson said that walking or standing for long periods elevates the pain (R. 60, 51). Ms. Hudson says she takes Naproxen for pain (R.60).

Ms. Hudson also testified that she has "constant" pain in her arms and hands (R. 78). She stated that her left hand does not sit straight (R. 83); she can lift her right hand only to slightly below shoulder level (R. 84); and she can raise her left hand only to her midsection (R. 85).

Ms. Hudson is left-hand dominant (R. 55) and testified that she cannot carry five pounds in her left hand (R. 83). She testified to limitations twisting, reaching for things, pushing buttons on

6

the phone, and that the pain she experiences moving her hands precludes returning to receptionist work (R. 78). Ms. Hudson also has trouble with zippers and buttons, and she cannot untie shoes (R. 54). She cannot handle papers individually (R. 79). Folding up clothes is "complicated," although she can put clothes in a washing machine and remove them from a dryer (R. 56). She testified that she does not mop her home (R. 57). She has trouble eating and using small tools or utensils (R. 82-83).

Ms. Hudson stated that she couldn't take books from a shelf at face-height if sitting at a desk, at least not without crying from pain (R. 85). She takes Aleve for the wrist and hand pain (R. 64).

Ms. Hudson also testified to various other conditions. Ms. Hudson cited various dermatological problems. Ms. Hudson stated that detergents and bleach irritate her skin (R. 55). She also claimed that she suffers from pus-filled "bumps" that transfer to different parts of her body by touch (R. 62). She testified that sometimes her skin is so dry she can peel it off her face in sheets (R. 62). She takes hydroxyzine for itching (R. 64).

Ms. Hudson testified to problems sleeping and with her mental state. She stated that she sleeps for one or two hours at a time, wakes up three to four times each night, and typically goes to bed between 9:00 and 11:00 p.m., gets up at about 5 a.m. (R. 57). She is tired all of the time (R. 85). Ms. Hudson also testified that she hears her dead parents "talk" to her all the time (R. 62). She described herself as withdrawn (R. 62), self-conscious about her weight (R. 63), and chronically depressed (R. 86). Ms. Hudson further testified that her concentration wanes and that she cannot carry out multiple tasks at the same time (R. 63).

7

## C.

We now turn to the medical evidence relating to Ms. Hudson's claimed impairments. The evidence is considered in chronological order, with the exception of Ms. Hudson's hospital records. Given that the hospital records address various patterns of treatment that collectively span several years, we address each set individually.

### 1.

We begin with consultative examinations conducted at Lake Shore Medical Clinic on October 10, 2003, by Dr. Embar and Dr. Rana (R. 199-205). Dr. Embar conducted a psychiatric evaluation of Ms. Hudson (R. 199-201). He recorded that her mood was depressed and that her affect was "anxious and appropriate" (R. 200). Dr. Embar noted that Ms. Hudson denied auditory and visual hallucinations, and had no "paucity of thought," flight of ideas, loose association or distractibility (R. 200). There was no evidence of psychotic symptoms (R. 201). Ms. Hudson had no special preoccupation, obsessions, phobia or delusions, although she did admit to worries (R. 200). Dr. Embar noted that she reported lapses in memory (R. 201). He also noted that Ms. Hudson was not on any medication and concluded that she was able to cope with her depression (R. 201). Dr. Embar summarized the evaluation by stating that Ms. Hudson suffered from intermittent depression since 1987 (R. 201).

Dr. Rana conducted an internal medicine evaluation at Lake Shore Medical Clinic (R. 202-05). Dr. Rana noted that Ms. Hudson complained of pain in both hands, especially in the left, with pain radiating up her arm to her shoulder (R. 202). Dr. Rana recorded Ms. Hudson's complaints of chronic dermatitis and eczema, as well as depression (R. 202). She noted that Ms. Hudson was using the medications triamcinolone ointment and Benadryl (R. 202).

8

Upon physical examination, Dr. Rana recorded that Ms. Hudson was 69" (5'9") without shoes and weighed 276.5 pounds. She also made other observations, including that Ms. Hudson was "grossly obese," but that she had no difficulty moving during the examination (R. 203). She recorded decreased grip in Ms. Hudson's left hand: 3-4/5 as compared to 5/5 for her right hand (R. 204). She noted that Ms. Hudson could lift, turn, and hold small objects with her left hand (R. 204). She used both hands to undress (R. 204). She could touch the tip of her left thumb with the tips of other fingers on the left hand (R. 204). Ms. Hudson was wearing splints on both wrists (R. 204).

Dr. Rana's overall diagnostic impression was: "carpal tunnel syndrome with slightly weaker left hand grip" (she did not specify whether both hands have, or one hand has, carpal tunnel syndrome), chronic dermatitis, and obesity (R. 204).

## 2.

We turn now to the agency reports. A physical RFC Assessment was conducted by Dr. Norbury for the Disability Determination Services ("DDS") on December 1, 2003, and approved by Dr. Conroy on April 22, 2004 (R. 172-79). Dr. Norbury reported a primary diagnosis of carpal tunnel syndrome, and a secondary diagnosis of chronic dermatitis (R. 172) (like Dr. Rana, the DDS report did not expressly state whether both hands had, or one hand had, carpal tunnel syndrome). Dr. Norbury concluded that Ms. Hudson could lift and/or carry (including upward pulling) a maximum of 50 pounds occasionally (one third of the time) (R. 173). Dr. Norbury further concluded that Ms. Hudson could lift and/or carry (including upward pulling) a maximum of 25 pounds frequently (two thirds of the time) (R. 173). He noted that Ms. Hudson had a grip strength of 3-4/5 in her left hand, and of 5/5 in her right hand, and could lift, hold, and turn small objects with her left

9

hand (R. 179). Ms. Hudson had no postural, manipulative, visual, communicative, or environmental limitations (R. 174-76), and had hyperpigmented dermatitis under both breasts (R. 179).

The DDS's assessment also included a psychiatric review of Ms. Hudson conducted by Dr. Low on December 1, 2003, and approved by Dr. Galassi-Hudspeth on April 21, 2004 (R. 180-93). Dr. Galassi-Hudspeth noted that Ms. Hudson suffered from affective disorders: depression and dysthymic disorder (R. 180). However, Dr. Galassi-Hudspeth noted that Ms. Hudson was not under psychiatric treatment, and was not using medication for her depression (R. 192). Nor had Ms. Hudson suffered any episodes of decompensation (R. 190). Dr. Galassi-Hudspeth assessed the degree of limitation imposed by the affective disorders, concluding that Ms. Hudson was mildly restricted in her activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace (R. 190).

### 3.

We now summarize other medical records relevant to Ms. Hudson's claimed disabilities. Records from Fantus Health Center at Stroger Hospital (R. 236-61) show multiple Outpatient Patient Progress Notes recording atopic dermatitis and hyperpigmentation from May, 2003 through to January 2005 (R. 240-54). Outpatient Progress Notes from an April 16, 2004 visit reported that Ms. Hudson had atopic dermatitis, along with hyperpigmented papules on Ms. Hudson's forehead, spreading to her cheeks (R. 194). Other records indicate evidence that as of January 10, 2006, Ms. Hudson's atopic dermatitis became poorly controlled because she had run out of hydrocortisone ointment and was using Vaseline to treat the condition (R. 241).

In addition, Progress Notes from August 11, 2004, show that Dr. Richard Brannegan completed an EMG report on August 11, 2004, following an EMG of both of Ms. Hudson's hands

10

and wrists (R. 255). Dr. Brannegan concluded that the findings from the EMG were "consistent with mild chronic compression of the right median nerve at the wrist (carpal tunnel). No median conduction abnormalities were noted on the left" (R. 255).

Records from Jackson Park Hospital (R. 211-35) show that an evaluation on July 30, 2005, found Ms. Hudson's back was in normal condition (R. 229). On August 6, 2005, Ms. Hudson's abdomen was x-rayed following one of a number of instances of abdominal pain: no acute findings were identified by the x-ray (R. 223). The Jackson Park Hospital records also show that Ms. Hudson was using hydroxyzine for eczema, and topical hydrocortisone to prevent itching (R. 228).

## D.

Two administrative hearings were held before the same ALJ. We address each in turn.

## 1.

At the first administrative hearing held on February 2, 2006, the ALJ reviewed the medical evidence and heard testimony from Ms. Hudson and a VE, Michelle Peters. We summarized above the testimony of Ms. Hudson that is material to our review. We address only the VE's testimony in this section.

The ALJ began his questioning of the VE by asking her to describe the skill and exertional level of the claimant's past work as a bartender, a receptionist and a switchboard operator (R. 65). The VE testified that the bartender position would have been low-end semiskilled and light in physical demand (R. 65), while the receptionist or switchboard operator positions were low-level semiskilled and sedentary in physical demand (R. 66).

The ALJ then asked the VE to consider a hypothetical person of the claimant's age, education, and vocational background, who could: on occasion lift or carry ten pounds; stand or walk

11

for six hours in an eight-hour day; sit for six hours in an eight-hour day (but who needed an at-will sit or stand option); push and pull not more than ten pounds; engage in bimanual gross and fine manipulation not more than one third of the day; and who needed to avoid skin contact with cleaning products, perfumes, and similar products. The ALJ asked if such a person could work as a bartender, or as a receptionist or switchboard operator. The VE testified that such a person could not work in those positions (R. 66).

The VE further stated that such a person would be limited to some type of service or manufacturing work (R. 66). The VE stated that the limitation on skin contact and the sit/stand at will requirement would preclude janitorial work, as one example of service work (R. 67). The VE also said the limits on gross and fine manipulation would eliminate manufacturing positions (R. 67).

## 2.

At the second administrative hearing, held on March 1, 2007, the ALJ again reviewed the medical evidence, this time including Exhibits 5F and 6F (the Jackson Park Hospital and John H. Stroger, Jr. Hospital records) which were received after the 2006 hearing.[4] He heard testimony from Ms. Hudson and from a different VE, Frank Mendrick. Again, we address only the VE's testimony in this section.

Claimant's counsel asked whether Ms. Hudson's work as a receptionist was "semiskilled, sedentary or unskilled sedentary" (R. 88). The VE replied in totality: "[i]t's semiskilled" (R. 88). The ALJ then asked what the equivalent rating for Ms. Hudson's bartender position would have been (R. 88). The VE replied that, according to one code, it would have been unskilled and light (R. 88).

---

[4] We address Exhibits 5F and 6F above. They are, respectively: records from Jackson Park Hospital for July to August, 2005, and records from John H. Stroger Jr. Hospital from November 2001 to January 2005.

He added, however, that if Ms. Hudson had been taking records on the stock it would have been semiskilled, and that if she had been stocking cases of beer it would have been medium (R. 88-89).

Claimant's counsel then asked the VE to consider, hypothetically, a person of the claimant's age, education, and vocational background who could: lift, carry, push or pull no more than 10 pounds; could sit six hours out of eight and otherwise had no limitations standing, walking, or sitting; who was limited to occasional reaching; who could spend no more than two thirds of the day grasping, reaching, and conducting fine and gross manipulations (R. 89-90). The ALJ asked if a person with those characteristics could work as a receptionist or bartender. The VE replied that such a person could not bartend (R. 90). As for the receptionist position, the VE noted that there are different types of receptionist jobs in the economy. The VE explained that the DOJ definition includes frequent reaching and handling, but only occasional fingering (R. 90). But, he further stated that there are telephone receptionists, who "basically just [answer] the phone" (R. 90); in response to that testimony, the claimant spontaneously stated: "That's what I did" (R. 90). The VE continued that if a telephone receptionist has a headset, then both hands are free to manipulate the switchboard, including the non-dominant hand (R. 90). As a result, "that job could probably still be done by the [hypothetical] person" (R. 90). The ALJ testified that this type of telephone receptionist is called an information clerk, which is a semiskilled position, and involves providing data or collecting data on the telephone (R. 91). The VE concluded: "[t]hat job could also be done because it's almost identical to a receptionist" (R. 91). The VE acknowledged that the information clerk position might require "frequent" reaching (R. 93). However, he said it would be possible to alternate hands, which would make the reaching "occasional" on a per-hand basis, and hence would make the work possible (R. 93).

13

Claimant's counsel added the hypothetical requirement that the person had to reach occasionally with both upper extremities (R. 93). The VE responded that reaching occasionally in this way would be accomplished by alternating hands in the information clerk job, so the ability to work in that position would turn on being able to reach alternately, not on reaching with both extremities simultaneously (R. 93). Claimant's counsel asked if the pushing of buttons required by the "receptionist" job (not being more specific about which type) amounts to occasional fingering (R. 93). The VE testified that it amounts to frequent fingering, but could again be achieved by alternating hands (R. 93).

Finally, claimant's counsel asked the VE to consider hypothetically whether a person could return to work who could perform the telephone receptionist and information clerk jobs under the physical conditions previously discussed, but whose physical condition affected concentration, attention, persistence and pace, and who would be able to maintain attention for only 80 percent of the workday due to pain (R. 94). The VE testified that not being able to pay attention full-time would preclude the information clerk and telephone receptionist positions (R. 94).

## IV.

We turn now to the ALJ's written opinions, which we address in chronological order.

## A.

In his first written opinion of March 13, 2006, the ALJ found at Step 1 that Ms. Hudson had not engaged in substantial gainful activity since the alleged onset of her disability: October 7, 2001 (R. 266).

At Step 2, the ALJ found that Ms. Hudson's chronic dermatitis, mild right carpal tunnel syndrome, and chronic left hand pain were "severe" under 20 C.F.R. § 416.920(c) (R. 266-67). The

ALJ found that the medical record demonstrated a longstanding history of atopic dermatitis. The ALJ noted that an EMG of November 8, 2004, showed mild compression of the right median nerve at the wrist (carpal tunnel). The ALJ also noted that Ms. Hudson had been examined for carpal tunnel in her left hand, but the test results were negative in this hand, despite swelling in the left wrist (R. 268). The ALJ further noted Ms. Hudson's history of obesity: she stood 69 inches tall and, as of October 10, 2003, weighed 276.5 pounds (R. 267).

At Step 3, the ALJ found that Ms. Hudson's medically determinable impairments were not sufficient to meet or medically equal a listed impairment, either singly or in combination (R. 267). Specifically, the ALJ found that Ms. Hudson's atopic dermatitis did not meet Listing 8.05 because it had responded to treatment. As evidence of the positive response of the dermatitis to treatment, the ALJ cited the worsening of Ms. Hudson's condition when she stopped using hydrocortisone ointment. The ALJ found that, although it was a limitation, Ms. Hudson's carpal tunnel syndrome did not meet Listing 1, because there was no documentation of inability to perform gross or fine movements effectively, such as would lead to "extreme loss of function" as required under 1.02B and 1.B2c (R. 267). The ALJ noted that Ms. Hudson's back pain was also not severe, because there was no recorded evidence of back pain or of Ms. Hudson even complaining about back pain prior to the administrative proceedings (R. 267-68). The ALJ also noted the absence of an x-ray Ms. Hudson claimed had been taken of her back at Jackson Park Hospital.

The ALJ further found that Ms. Hudson's diagnosed depression and dysthymic disorder were not severe, and did not meet Listing 12.04 (R. 267). In reaching this finding, the ALJ agreed with the DDS's assessment of October 10, 2003, that Ms. Hudson's depression was mild with respect to

activities of daily living, maintaining social functioning, concentration, persistence and pace, and that there was no evidence of decompensation (R. 267).

The ALJ explained that he found Ms. Hudson's statements regarding her limitations to be not totally credible, because the medical evidence did not support them (R. 268). In support of that finding, the ALJ provided as an example the evidence that carpal tunnel syndrome had been noted in plaintiff's right hand by the EMG of November 8, 2004, but not in her left hand – the hand which Ms. Hudson claimed was more painful and impaired (R. 268).

The ALJ determined that plaintiff had the following RFC: she could lift, carry, push or pull up to 10 pounds; she could sit, stand, or walk for six hours in an eight-hour day; she was limited to frequent (but less than two-thirds of the day) fine and gross manipulation with her dominant left hand, and to less than constant (but more than two-thirds of the day), fine and gross manipulation with her right hand; and she had to avoid skin contact with cleaning products, perfumes, and similar products (R. 269). Then, at Step 4, the ALJ found that with this RFC, plaintiff could perform her prior work as a switchboard operator/receptionist (which was semi-skilled, sedentary work) and a bartender (which was semi-skilled, light work) (R. 269). Having found at Step 4 that plaintiff was not disabled, the ALJ did not reach Step 5 (R. 268-69).

## B.

In his second written opinion, dated July 24, 2007, the ALJ stated: "I adopt the earlier decision of March 13, 2006…except to say the claimant offered an explanation as to why her left hand is worse than the right – a mistake in the records" (R. 22). The ALJ noted plaintiff's claim that the EMG showing carpal tunnel in her right, rather than her left, hand was the result of a clerical

16

error in the records. The ALJ noted the amended onset date (from October 1, 2001 to November 6, 2005) requested by Ms. Hudson's attorney at the second hearing (R.22).

The ALJ also summarized plaintiff's claims concerning her limitations, and reiterated – with no change – the explanation offered in the first opinion for his conclusion that plaintiff's testimony in that regard was not entirely credible (R. 22-23).

The ALJ then noted that VE Mendrick had concluded that plaintiff could perform her prior work as a receptionist based on the following hypothetical: "a capacity to lift/carrying 10 pounds, stand/walk and sit 6-hours, push and pull 10 pounds, occasion fine and gross manipulation with the right upper extremity, and frequent fine and gross manipulation with the right upper extremity, and occasional reaching with both upper extremities" (R.23). The ALJ further stated that VE Mendrick's conclusion that plaintiff could perform her prior work as a receptionist was consistent with the opinion offered by VE Peters at the first hearing (*Id.*). The ALJ thus concluded, as he did in the first opinion, that plaintiff was not disabled.

## V.

Plaintiff makes four arguments in support of her motion for summary reversal and/or remand. *First*, plaintiff argues that the ALJ erred at Step 4 because the ALJ did not inquire into or identify the specific duties of her prior work as a receptionist (Pl.'s Mem. at 8-10). *Second*, plaintiff argues that "the ALJ's reliance upon both VEs' testimony to find that Ms. Hudson could perform her past relevant work as a receptionist was in error," because the first VE in fact testified that plaintiff could not return to her previous jobs (Pl.'s Mem. at 10, citing R. 66-67). *Third*, plaintiff contends that the assessment of her RFC was legally insufficient because the ALJ failed to apply the "special technique" required by SSR 96-8p and 20 C.F.R. § 404.1520a(b)(1) (Pl.'s Mem. at 12-14). *Fourth*,

plaintiff argues that there are three reasons why the ALJ's assessment of the credibility of her medical complaints, as part of her RFC assessment, was improper: (1) plaintiff's testimony that the ALJ cited suggests that her complaints were credible (and therefore that the ALJ had to articulate reasons for rejecting the testimony); (2) the ALJ relied solely on a lack of supporting medical evidence as to her hand and finger pain; and (3) the ALJ failed to consider the effect of plaintiff's obesity in combination with her other impairments.

Embedded in plaintiff's second and third arguments is the proposition that the ALJ erred in assessing her RFC. After review of the record, the Court finds that the ALJ did not adequately explain the rationale for his RFC assessment and determination by creating a "logical bridge" between the evidence in the record and his conclusion, as required by the Seventh Circuit. *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (logical bridge requirement); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) (minimal articulation requirement). Thus, we remand for further findings consistent with the directions that follow.

### A.

The ALJ conducted two administrative hearings and wrote two opinions; in both opinions, he found plaintiff was not disabled. The ALJ's finding of no disability was based on his conclusion, based on the RFC determination he made, that plaintiff had the ability to perform her past relevant work as a receptionist. The following chart compares the hypothetical questions asked of the two vocational experts and the ALJ's RFC determination:

| Hypo. 2006 Hearing (R. 66) | RFC 2006 Decision (R. 268) | Hypo. 2007 Hearing (R. 89-90) | 2007 Decision Reciting the Hypo. from the 2007 Hearing (R. 23) |
|---|---|---|---|
| on occasion lift or carry 10 pounds | lift, carry up to 10 pounds | lift or carry ≤ 10 pounds | lift or carry 10 pounds |
| push and pull up to 10 pounds | push or pull up to 10 pounds | push or pull ≤ 10 pounds | push and pull 10 pounds |
| stand or walk for 6 hours | stand or walk for 6/8 hours | sit 6/8 hours (no limits) | stand or walk for 6 hours [changed] |
| sit for 6 hours (but with an at-will sit or stand option) | sit for 6 hours [omitted at-will sit or stand option] | sit for 6 hours [omitted at-will sit or stand option] | sit for 6 hours [omitted at-will sit or stand option] |
| engage in bimanual gross and fine manipulation ≤ 1/3 of the day | ≤ 2/3 ("frequent") day fine and gross manipulation with left hand | ≤ 2/3 day fine and gross manipulation, reaching, grasping | ≤ 2/3 ("frequent") day gross and fine manipulation with the right "upper extremity" |
| | > 2/3 but < constant day fine and gross manipulation with right hand | | < 1/3 ("occasional") day reaching with the right upper extremity |
| needs to avoid skin contact with cleaning products, perfumes, and similar products | needs to avoid skin contact with cleaning products, perfumes, and similar products | [missing] | [missing] |

The chart shows discrepancies between the hypothetical asked of VE Peters at the first hearing and the RFC the ALJ set forth in the first opinion (which he adopted in the second opinion); between the RFC and the hypothetical asked of VE Mendrick at the second hearing; and between the hypothetical that actually was asked of VE Mendrick at the second hearing and the ALJ's rendition of that hypothetical in the second opinion. The ALJ's opinions do not explain those discrepancies. We explain below why we consider those discrepancies significant and troubling.

**1.**

We begin with the ALJ's omission from the RFC of the limitation that plaintiff have the option to stand or sit at will. During the 2006 hearing, the ALJ asked VE Peters a hypothetical that included that limitation. And, based on the hypothetical presented to her, VE Peters testified that plaintiff could not perform her past work.

Neither of the ALJ's opinions explains why, after including the limitation that plaintiff must have the option to sit or stand at will in his hypothetical at the first hearing, he then excluded it from the RFC. What's more, we cannot conclude that this point is a trivial one. The receptionist job that the ALJ found plaintiff can perform is classified as "sedentary." The United States Department of Labor defines a sedentary job as work that involves "sitting most of the time" with only occasional walking or standing. At the first hearing, VE Peters opined that if plaintiff had to have an option to sit or stand at will (along with the other limitations in the hypothetical), then plaintiff could not work as a receptionist. At the second hearing, in response to a hypothetical that did not include this limitation, VE Mendrick testified that plaintiff "probably" could do the work of a receptionist – not the most ringing endorsement of plaintiff's ability to perform that job.

In these circumstances, it was incumbent on the ALJ to explain why he decided to exclude the limitation that plaintiff must be able to stand or sit at will and why that limitation would not preclude her from working as a receptionist, contrary to VE Peters's testimony. The ALJ's failure to do so requires remand.

The testimony by VE Mendrick made it clear that Ms. Hudson's ability to reach and grasp and to use her fingers in pushing buttons was essential to the receptionist job, whether she wore a headset or not (R. 90). The ALJ found that plaintiff had an RFC that plaintiff could engage in fine and gross manipulation with her left hand frequently (which under the regulations is less than or equal to two-thirds of an eight-hour work day), and with her right hand more than frequently but less than constantly (R. 268).

Once again, this aspect of the RFC departed significantly from the hypothetical that the ALJ asked VE Peters. At the first hearing, VE Peters was asked to assume a person whose ability to engage in gross and fine manipulation with each hand was limited to up to, but not more than, one-third of an eight-hour work day. And, again, this discrepancy is not a trivial one. Translated into hours, the ALJ's RFC finding is that plaintiff could engage in fine and gross manipulation up to 5.33 hours a day with her left hand and even longer with her right hand; by contrast, the hypothetical posed to VE Peters indicates that plaintiff could not engage in fine or gross manipulation with either hand for more than 2.67 hours a day. Based on the hypothetical with this greater limitation, VE Peters stated that plaintiff could not perform her prior work as a receptionist.

In his 2006 opinion (which he re-adopted in his 2007 opinion), the ALJ did not articulate either the rationale for this change between the hypothetical he asked VE Peters and his RFC determination, or the evidentiary basis for that change. Nor did the ALJ explain why he found that plaintiff's ability to manipulate her *left hand* was more limited than her ability to manipulate her *right hand*, given the ALJ's finding that the medical evidence showed mild carpal tunnel in the right hand but only swelling of the left wrist and slightly weaker left hand grip in the left hand (R. 23).

21

At the 2007 hearing, the ALJ did not pose a new hypothetical to VE Mendrick. Rather, plaintiff's attorney posed a hypothetical with yet a different limitation on fine and gross manipulation: no more than two-thirds of an eight-hour work day with each hand (R. 89-90). In response, VE Mendrick stated that plaintiff "probably" could perform her past work as a reception.

We do not know what to make of this hypothetical. The limitation on manipulation in the hypothetical to VE Mendrick was not as restrictive as that contained in the hypothetical to VE Peters in the first hearing (manipulation for no more than one-third of each day with each hand), but was less restrictive than the RFC (which allowed manipulation for more than two-thirds of each day with the right hand). Moreover, in his 2007 opinion, the ALJ misstated the hypothetical to VE Mendrick on this point: the ALJ stated that the hypothetical limited plaintiff to "occasional fine and gross manipulation with the *right* upper extremity, and frequent fine and gross manipulation with the *right* upper extremity (R. 23) (emphasis added). Plainly, the ALJ did not intend to state that the hypothetical contained conflicting limitations for the right side – but, we do not know which he intended to apply to the right side and which to the left. More important, the hypothetical to VE Mendrick did not include different levels of restriction for the right and left side. To further complicate matters, neither the hypothetical to VE Mendrick nor the ALJ's inaccurate recitation of it tracks the RFC finding.

The ALJ did not explain any of these dizzying inconsistencies. We cannot deem this failure of articulation to be harmless. The ALJ ultimately adopted an RFC with restrictions on manipulation that were more limiting than the hypothetical posed to VE Mendrick. Given VE Mendrick's lukewarm statement that with a lesser limitation plaintiff "probably" could perform her prior work as a receptionist, we cannot exclude the possibility that if presented with a hypothetical that included

the limitation on manipulation presented to VE Peters at the 2006 hearing, VE Mendrick would have agreed with VE Peters that plaintiff could not perform her prior work.

### 3.

The hypothetical to VE Peters included the limitation that plaintiff avoid skin contact with cleaning products, perfumes, and similar products (R.66). In response to that hypothetical, VE Peters stated that a person could not perform plaintiff's prior work as a bartender or receptionist/switchboard operator (*Id.*).

In his 2006 opinion, the ALJ included this limitation in the RFC (R. 268). But, he found plaintiff was able to perform her prior work as a receptionist/switchboard operator without explaining – or even acknowledging – the contrary opinion of VE Peters. The ALJ was obliged to come to grips with that contrary evidence, and was not at liberty to simply ignore it. *Connor v. Shalala*, 900 F. Supp. 994, 1003-04 (N.D. Ill. 1995) (quoting *Cunningham v. Shalala*, 88 F. Supp. 537, 551 n. 15 (N.D. Ill. 1995) and citing *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995) ("An ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning"). Then, in his 2007 opinion, the ALJ adopted the opinion offered by VE Mendrick that plaintiff could perform that prior work, despite the fact that VE Mendrick's opinion was based on a hypothetical that did not include this limitation on skin contact that was a part of the RFC. To make matters worse, in the 2007 opinion the ALJ mischaracterized VE Peters as having opined in the 2006 hearing that plaintiff could perform her prior work as a receptionist (R. 23).

Perhaps the ALJ disregarded this limitation because he considered it irrelevant to her prior work as a receptionist (as opposed to her prior work as a bartender, which the ALJ did not find she

could perform). If so, the ALJ has offered no explanation as to the evidentiary basis for such a conclusion. In response to the hypothetical that contained the limitation on skin contact with certain products, VE Peters testified without equivocation that under this hypothetical a person could not work either as a bartender or a receptionist/switchboard operator. She was not asked, and did not testify, that the limitation on skin contact would affect one of those jobs but not the other. And, VE Mendrick was not presented with this limitation at all in the hypothetical he answered (a failing that lies with plaintiff's counsel at that hearing, who posed the hypothetical). Once again, the ALJ's handling of this point falls short of meeting the minimum articulation standard.

### 4.

We have discussed the foregoing deviations and inconsistencies individually; taken collectively, they reveal the picture of an opinion that cannot stand.[5] VE Peters opined that plaintiff could not perform her prior work in response to a hypothetical that included these limitations: (a) no more than six hours of sitting, but with the option to sit or stand at will; (b) no more than one-third of an eight-hour work day engaged in gross or fine manipulation with either hand; and (c) avoidance of skin contact with cleaning products, perfumes, and similar products. In his 2006 opinion, the ALJ – without explanation – eliminated that first restriction and relaxed the second restriction. He then found that plaintiff could perform her work as a receptionist/switchboard operator, without acknowledging either that his RFC varied from the hypothetical he posed to VE Peters or that he was disregarding VE Peters's opinion. Later, in his 2007 opinion, the ALJ adopted

---

[5]We note another unexplained deviation between the hypothetical to VE Peters and the RFC. The RFC states that plaintiff can lift and carry up to 10 pounds, while the hypothetical assumed a person who could do so only occasionally. We have not discussed this point because, even if the ability to lift and carry this weight can be done only occasionally, that alone would not preclude sedentary work, which only requires the ability to lift, carry, push, pull or otherwise move objects up to 10 pounds occasionally. *Dias v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 645, (7th Cir. 2007) (discussing U.S. Dept. of Labor definition).

24

VE Mendrick's opinion that plaintiff could perform her prior work as a receptionist/switchboard operator: an opinion that was based on a hypothetical that deviated from both the hypothetical to VE Peters and the RFC determined by the ALJ. In so doing, the ALJ mischaracterized VE Peters's opinion.

Whether viewed singly or together, the ALJ's 2006 and 2007 opinions are a model of ambiguity, not clarity. They call out for a minimal articulation of the ALJ's basis for his RFC determination, and a logical bridge from the evidence to the conclusion. That task is not assigned either to the Commissioner in defending the opinions on review, or to the reviewing court. That job is for the ALJ. We remand the case for the ALJ to properly perform that job.

## CONCLUSION

As should be evident from our decision to remand the case (rather than to reverse and enter judgment for plaintiff), we express no view on the ultimate question of whether plaintiff is disabled. That decision is committed to the ALJ in the first instance. On remand, the ALJ may decide that more evidence is required; or, without taking more evidence, that the RFC must be adjusted; or, with or without more evidence, he may offer an explanation for an unchanged RFC finding that satisfies the minimal articulation standard and is supported adequately by the evidence.

For the reasons set forth above, the Court directs the Clerk of the Court to enter judgment in favor of Ms. Hudson and against the Commissioner. Thus, the Court grants the claimant's motion

for remand (doc. # 24), and denies the Commissioner's motion for summary affirmance (doc. ## 26,

28). This case is terminated.[6]

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: August 24, 2009

---

[6] In light of this remand order, we find it unnecessary to address the other arguments that plaintiff has raised. On remand, the ALJ will be free to re-examine and reassess those points, including his use of the special technique and his credibility decisions in determining plaintiff's RFC.